**UNITED STATES DISTRICT COURT**

**MIDDLE DISTRICT OF LOUISIANA**

**DENNIS VALENTINE, JR.**                                 **CIVIL ACTION**

**VERSUS**                                                              **NUMBER 10-510-JJB-DLD**

**MICHAEL J. ASTRUE, COMMISSIONER**
**OF SOCIAL SECURITY**

## MAGISTRATE JUDGE'S REPORT

Plaintiff Dennis Valentine, Jr. seeks judicial review of a final decision of the Commissioner of the Social Security Administration (the "Commissioner") denying his claim for disability insurance benefits (DIB) and supplemental security income (SSI) benefits.

### *Background*

Plaintiff filed an application for benefits on May 25, 2006, with a protective filing date of May 12, 2006,[1] alleging a disability onset date of September 3, 2003 (TR 177), due to "detached retina, diabetes, high blood pressure, depression," stating that he has "to put things close to face to see, right eye is gone and left eye is weak. . . ." (TR 197) The initial disability determination listed a primary diagnosis of diabetes mellitus and a secondary diagnosis of adjustment disorder with depressed mood. (TR 117). The application was denied initially, and a hearing subsequently was held on July 17, 2008. (TR 48-94 - transcript of oral hearing.) An impartial medical expert (psychologist), and an impartial vocational expert appeared and testified at the hearing. (*Id.*) While there is a transcript of this hearing, the record is void of any decision arising from that hearing. A supplemental hearing was held on December 9, 2008. (TR 95-116) The ALJ subsequently denied plaintiff's claims on January

---

[1]The ALJ's decision of January 27, 2009, incorrectly lists the application date as May 11, 2006. (TR 20)

27, 2009 (TR 20-27), and on May 5, 2010, the Appeals Council denied plaintiff's request for review, making the ALJ's decision the final decision for purposes of judicial review. (TR 27)

In denying plaintiff's claims, the Commissioner's administrative law judge ("ALJ") reached the fifth and final step of the five-step sequential disability analysis set forth in 20 C.F.R. § 404.1520(b)-(f) & 416.920(b)-(f).[2] The first two steps involve threshold determinations. The ALJ initially determined that plaintiff had not engaged in substantial gainful employment since his alleged onset date of disability, thereby satisfying the first step in the sequential process. (TR 16) At the second step, the ALJ determined that plaintiff suffered from the following severe impairments: right eye blindness, reduced vision in the left eye, and fairly controlled diabetes mellitus. (TR 22)

At step three of the process, the ALJ determined that plaintiff did not have an impairment or combination of impairments that met or were medically equivalent to the criteria of one of the listed impairments set forth in the Commissioner's regulations at 20 C.F.R. pt. 404, subpt. P, Appendix 1. (TR 14) The ALJ then determined that plaintiff had the residual functional capacity[3] ("RFC") to perform the full range of work at all exertional levels but with the following non-exertional limitations: right eye blindness and reduced vision in the left eye. (TR 24)

At step four of the sequential process, the ALJ determined that plaintiff was unable to return to his past relevant work as a janitor for a restaurant, security guard, farm laborer, and construction worker. (TR 25) The burden then shifted to the Commissioner at step five of the

---

[2] *See, e.g., Harrell v. Bowen*, 862 F.2d 471, 475 (5th Cir. 1988).

[3] Residual functional capacity ("RFC") is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis, *i.e.*, 8 hours a day, for 5 days a week, or an equivalent work schedule. *Myers v. Apfel*, 238 F.3d 617, 620 (5th Cir. 2001), *citing* SSR 96-8p.

process to show that plaintiff could perform significant numbers of jobs existing in the national economy, consistent with plaintiff's medical impairments, age, education, past work experience (if any), and RFC. *Shave v. Apfel*, 238 F.3d 592, 594 (5th Cir. 2001). Based upon the substantial evidence in the record, including the testimony of a vocational expert during the first administrative hearing, the ALJ determined that plaintiff was able to perform a significant number of jobs in the national economy based on Medical-Vocational Guidelines Rule 204.00. (TR 26) The ALJ therefore concluded that plaintiff was not disabled for purposes of the Social Security Act. (TR 27)

***Statement of Errors***

In his present appeal, the error alleged by plaintiff can be summarized as follows:

(1) The ALJ improperly relied upon the Medical-Vocational Guidelines to reach his finding that the plaintiff was not disabled.

## *GOVERNING LAW*

In reviewing the Commissioner's decision to deny disability and SSI benefits, the Court is limited to a determination of whether the Commissioner's decision was supported by substantial evidence existing in the record as a whole and whether the Commissioner applied the proper legal standards. *E.g., Harrell v. Bowen*, 862 F.2d 471, 475 (5th Cir. 1988). In applying the "substantial evidence" standard, the Court must carefully scrutinize the record to determine if, in fact, substantial evidence supporting the decision does exist, but the Court may not reweigh the evidence in the record, nor try the issues *de novo*, nor substitute its judgment for the Commissioner's even if the evidence preponderates against the Commissioner's decision. *Id.* Substantial evidence means more than a scintilla, but less than a preponderance, and is such relevant evidence as a reasonable mind might accept to

support a conclusion.  *Id.*  A finding of "no substantial evidence" will be made only where there is a conspicuous absence of credible choices or an absence of medical evidence contrary to the claimant's position.  *Id.*  In order for the Court to find there is "no substantial evidence" supporting the ALJ's conclusions, this court "must conclude that there is a 'conspicuous absence of credible choices' ..." *Dellolio v. Heckler*, 705 F.2d 123, 125 (5th Cir.1983) (*citing Hemphill v. Weinberger*, 484 F.2d 1137 (5th Cir.1973)).  "Conflicts in the evidence are for the Secretary and not the courts to resolve." *Selders v. Sullivan*, 914 F.2d 614, 617 (5th Cir.1990) (*citing Patton v. Schweiker*, 697 F.2d 590, 592 (5th Cir.1983).

The overall burden of proving disability under the Social Security Act rests on the claimant.  *Jones v. Heckler*, 702 F.2d 616, 620 (5th Cir. 1983).  If a claimant proves that he no longer is able to work in his prior job, then the burden shifts to the Commissioner to show that there is some other type of substantial gainful activity that the claimant can perform.  *Id.* Thus, in cases such as this one where the Commissioner determines that the claimant cannot perform his past relevant work and accordingly reaches the fifth step of the five-step disability sequential analysis, the Commissioner bears the burden of establishing that there is other work in the economy that the claimant can perform.  *Perez v. Schweiker*, 653 F.2d 997, 999-1000 (5th Cir. 1981).  If the Commissioner adequately points to potential alternative employment, the ultimate burden of persuasion then returns to the claimant to prove his inability to perform those jobs.  *Kraemer v. Sullivan*, 885 F.2d 206 (5th Cir. 1989); *Mays v. Bowen*, 837 F.2d 1362, 1364 (5th Cir. 1988); *Fruge v. Harris*, 631 F.2d 1244, 1246 (5th Cir. 1980).

***Arguments of the Parties***

The issue before this Court is whether the Commissioner's finding that Dennis Valentine, Jr. is not disabled is supported by the substantial evidence and was reached by applying the proper legal standards.  42 U.S.C. § 405(g).

Plaintiff first argues that the ALJ failed to cite to any evidence from a vocational expert to support his decision that there are jobs in the national economy plaintiff could perform as required by Social Security Ruling 96-8p and 20 CFR 404.1512. Further, plaintiff argues that the RFC determination does not take into consideration Dr. Holloway's opinion regarding plaintiff's other restrictions such as his inability to drive an automobile. Plaintiff cites to *Fields v. Bowen*, 805 F.2d 1168, 1170 (5th Cir. 1986) for the proposition that the ALJ was required to use expert testimony to establish the existence of jobs which the plaintiff could perform. (rec.doc. 8-1)

In response, the Commissioner asserts that the ALJ explicitly considered Dr. Holloway's opinion and incorporated the eyesight limitations into the RFC assessment. Additionally, the Commissioner notes that the ALJ found that the nonexertional sight limitations "have little or no effect on the occupational base of unskilled work at all exertional levels (rec.doc. 11, pg. 4; TR 26), and cites to *Fraga v. Bowen*, 810 F.2d 1296, 1304 (5th Cir. 1987) for the proposition that the "mere presence" of a nonexertional impairment does not preclude use of the Medical-Vocational Guidelines.

## *DISCUSSION AND ANALYSIS*

In this matter, there is no dispute that plaintiff has no sight in his right eye. The dispute is whether the ALJ's decision regarding the effect of plaintiff's reduced vision in his left eye on his ability to work was supported by substantial evidence and was reached using the applicable legal standard. Here, there were two hearings: the first hearing included testimony by a mental health professional and a vocational expert (VE); the second hearing did not include testimony from either a medical expert or a VE.

At the first administrative hearing, after some discussion with plaintiff's counsel, the ALJ stated that an eye examination in November, 2005, determined the vision in plaintiff's left eye to be 20/40, while the "most recent one does indicate 20/70," and stated that he would send the plaintiff for a visual exam. (TR 88) Immediately following this discussion, the ALJ moved on to discussing plaintiff's past relevant work as a security guard with the VE. The ALJ framed a question to the VE as follows:

> ALJ: We'll have that re-approached thing (sic) something like this. What vision acuity, not in terms of 20/40, 20/60, 20/70, what demands of vision would there be in the security work?
>
> VE: Hold on, Your Honor. Security guard near vision would be frequent. Far would be occasional.

(TR 89)

When the ALJ asked the VE how plaintiff's inability to read newspaper print affects security work, the VE determined "that would undermine it." (TR 90) The ALJ then asked how the plaintiff's inability to read newspaper print would "affect the universe of un-skilled, light and medium work? Would it eliminate the majority or leave the majority?" The VE replied, "Well, un-skilled work does not require as much reading as does semi-skilled and skilled. I would say it would reduce the base by about a third." (TR 90)

After further discussion with plaintiff's counsel, the ALJ again examined the VE, asking if she was "familiar with roughly what the percentage of the visual field that one eye blindness affects," and the VE responded with, "No. No, I'm not. . . But I know others that are blind in one eye that do drive." (TR 91) The following exchange then occurred:

> ALJ: Yeah. Counsel, you can do kind of a field test if you would take one hand and cover one eye as to what you can see and looking straight ahead. You are pretty much eliminating about 40 percent or 30 to 40 percent of your visual field off to the right when you do that.
> ATTY: That's actually --

> ALJ: I mean, it's not like 50 percent. You've got, unless you have got a very high bridge on your nose. If you're a prize fighter and got your nose busted up a dozen times, maybe it would be more than that, but ordinarily, yeah, you've got what you've got –
>
> ATTY: I think the literature --
>
> ALJ: – a lot of bright visual field out of the good eye.

(TR 91)

At this point, plaintiff's counsel advised the ALJ that he had a "great deal" of questions prepared for a medical visual expert, but the medical expert at the first hearing was a mental health professional who had stated that it was not appropriate for him to give a medical opinion as to any possible diabetic damage to the left eye. (TR 91, 84) The ALJ then advised that he would send plaintiff for a consultative visual examination. (TR 92)

After the visual examination, another hearing was held, and plaintiff testified that Dr. Holloway, an opthalmologist, told him "don't drive." The ALJ asked plaintiff if Dr. Holloway had talked about his "fields of vision" and "visual acuity," and plaintiff responded, "No." (TR 106) Next, the ALJ began his examination of Dr. Thomas Fain, a clinical psychologist, who appeared at the second hearing as the medical expert. Dr. Fain summarized plaintiff's medical history, but the only testimony Dr. Fain provided regarding plaintiff's vision was a one-line statement regarding a 2006 physical examination, wherein he noted that the doctor conducting that exam noted "the loss of vision in his [plaintiff's] right eye at about 30 years ago and he has glasses for his left eye." (TR 111) Dr. Fain's testimony mostly concerned plaintiff's mental heath and physical condition. (TR 111-112) Plaintiff's counsel then stated he did not "have any questions regarding mental health," and further stated:

> Your Honor, only if this medical expert feels and I think during our last hearing my memory may be faulty, but I believe when asked this, the response regarding any opinions concerning the diabetic vision related problems, the expert said he wasn't, he didn't feel like he could give an opinion. So I would

7

> reserve those again. That was the whole point I understood for getting the ophthalmologist review.

(TR 113)

There was no further testimony from the medical expert, and the ALJ noted that the VE "got sick" and was not able to attend, which concluded the hearing. (TR 114-115)

Thereafter, the ALJ's decision was rendered, and the ALJ noted in the decision that in 2005, Dr. Mark Meadows diagnosed plaintiff with a retinal detachment in his right eye, two corneal scars and diabetic retinopathy. (TR 25) The ALJ noted that plaintiff's vision "had remained poor with decreased vision in the left eye," he "could not read fine print," was advised to avoid operating machinery and avoid people approaching him from the side." (*Id.*)

The ALJ next discussed the results of the consultative visual exam conducted by Dr. Ashton Holloway in August, 2008, between the time of the first and second hearings. The ALJ noted that Dr. Holloway opined that, without correction, plaintiff could see hand movement only in his left eye, and with correction, plaintiff's vision in the left eye was 20/70. The ALJ noted Dr. Holloway's diagnosis of "retinal detachment of the right eye, diabetes and myopic degeneration of the left eye," and that the prognosis was fair to poor. The ALJ also specifically noted that the decreased vision in the left eye was from diabetic retinopathy. (TR 25)

The ALJ then found that plaintiff was unable to perform any past relevant work as a janitor for a restaurant, security guard, farm laborer or construction worker, and opined that if a claimant has "solely nonexertional limitations, section 204.00 in the Medical-Vocational Guidelines provides a framework for decisionmaking. The ALJ determined that "a finding of 'not disabled' is therefore appropriate under the framework of section 204.00." The ALJ then referred to Rule 203.00 of Appendix 2, and stated that there were "approximately 2,500

separate sedentary, light and medium occupations existing in the national economy which the plaintiff could perform" (TR 26), with the "nonexertional limitations of right eye blindness and reduced vision in the left eye." (TR 24)

Here, while the ALJ states that he used the Medical-Vocational Guidelines as a framework for his decision, the record evidence indicates otherwise.[4] First, the Fifth Circuit has been consistent in holding that once an ALJ determines that a plaintiff suffers from a nonexertional impairment that prevents him from performing his past work and the full range of other available work, the Commissioner "must produce expert vocational testimony or other similar evidence to establish that jobs exist in the national economy" that the plaintiff can perform. *Fields v. Bowen*, 805 F.2d 1168, 1170 (5th Cir. 1986). As set forth in *Fields*, "the value of a vocational expert is that he is familiar with the specific requirements of a particular occupation, including working conditions and the attributes and skills needed." *Id.* In this case, other than the brief testimony by the VE in the first hearing that the inability to read newsprint would decrease the occupational base by approximately one-third, no VE or medical expert testified at the second hearing regarding plaintiff's opthalmologic consultative exam by Dr. Holloway. The court notes that Dr. Holloway's examination revealed additional limitations which were not addressed either by the ALJ in his ruling, any medical expert at the hearing, or by a VE. For example, Dr. Holloway determined that plaintiff could not read very small print, ordinary newspaper or book print, and could not view a computer screen. (TR 419) Dr. Holloway further determined that plaintiff could not drive an automobile or operate machinery. (TR 414)

---

[4]Appendix 2 to Subpart P of Part 404, otherwise known as the Medical-Vocational Guidelines, states in section 200.00(c) that "the rules do not direct factual conclusions of disabled or not disabled for individuals with solely nonexertional types of impairments."

Further, Social Security Ruling 85-15 states that "given that no medically determinable impairment limits exertion, the RFC reflecting the severity of the particular nonexertional impairment(s) with its limiting effects on the broad world of work is the first issue. The individual's relative advantages or adversities in terms of age, education, and work experience is the second."

Also, SSR 85-15 states that:

> Given no medically determinable impairment which limits exertion, the first issue is how much the person's occupational base — the entire exertional span from sedentary work through heavy (or very heavy) work — is reduced by the effects of the nonexertional impairment(s). This may range from very little to very much, depending on the nature and extent of the impairment(s). In many cases, a decisionmaker will need to consult a vocational resource.
>
> The publications listed in sections 404.1566 and 416.966 of the regulations will be sufficient vocational resources for relatively simple issues. In more complex cases, a person or persons with specialized knowledge would be helpful. State agencies may use personnel termed vocational consultants or specialist, or they may purchase the services of vocational evaluation workshops. Vocational experts may testify for this purpose at the hearing and appeals levels. In this PPS, the term vocational specialist (VS) describes all vocational resource personnel.

SSR 85-15.

In this case, plaintiff was a younger individual with at least a high school education who was able to communicate in English. (TR 25) There was no testimony as to the skill level of plaintiff's past relevant work as a security guard and farm laborer,[5] and the ALJ noted that the transferability of plaintiff's job skills was not material to his determination." However, there is nothing in the record or the decision to suggest that the ALJ considered the erosion of the occupational base due to plaintiff's particular vision problems, especially in light of the increased decrease in plaintiff's left eye vision from a correctable 20/40 to 20/60 between

---

[5]The VE testified at the first hearing that plaintiff's past work as a janitor for a restaurant was not substantial gainful activity." (TR 85)

2005 and 2008, and the diabetic retinopathy. The ALJ also did not present a proper hypothetical to a VE which included plaintiff's vision limitations, his visual field, or his visual acuity, and plaintiff was not given a real opportunity to correct the deficiencies in the hypothetical because there was no VE present at the second hearing following the ophthalmology examination by Dr. Holloway.[6] Moreover, neither hearing included a medical expert who could testify as to plaintiff's visual field and visual acuity in either eye, or discuss the effects or prognosis of diabetic retinopathy with regard to plaintiff's ability to work. It is clear that the ALJ based his decision on the VE's personal knowledge of other people who can drive with one blind eye and his own "field test" relating to percentage of vision lost to blindness as there was no medical testimony or record evidence to support his decision of non-disability. Finally, while the court notes that while the ALJ did not include the VE's personal knowledge of others who can drive with one blind eye and his own non-medical "field test," it is abundantly clear that no other analysis was undertaken to determine the nature and full extent of plaintiff's vision impairments on the erosion of the occupational base of 2,500 jobs. As just a few examples of the ALJ's non-analysis, the court notes that the ALJ did not discuss the effect or non-effect on the occupational base of diabetic retinopathy in plaintiff's left eye, which was evidenced by the decreasing vision between 2005 and 2008 and noted by the doctors; the notation in Dr. Holloway's report that plaintiff's prognosis was "fair to poor;" or Dr. Holloway's additional limitations relating to working with machinery, reading book print, or viewing a computer screen.

Thus, as it is clear the guidelines are inapplicable to this case because plaintiff's limitations were solely nonexertional, and the Commissioner failed to present similar

---

[6] *Bowling v. Shalala*, 36 F.3d 431, 436 (5th Cir. 1994). *See, also, Morris v. Bowen*, 864 F.2d 333, 336 (5th Cir. 1988).

evidence or proper VE testimony following Dr. Holloway's report, the ALJ's decision was not based on substantial evidence.

## *RECOMMENDATION*

It is the recommendation of the magistrate judge that the decision of the Commissioner denying benefits be reversed and the matter be remanded to the Commissioner for further proceedings consistent with the opinion of the Court, including expert vocational testimony or similar evidence, expert medical testimony or similar evidence, and presentation of any further relevant evidence developed by the parties.[7]

Signed in Baton Rouge, Louisiana, on March 1, 2012.

**MAGISTRATE JUDGE DOCIA L. DALBY**

---

[7] See *Brenem v. Harris*, 621 F.2d 688, 690 n.1 (5th Cir. 1980)("with a remand ordered the hearing should cover all pertinent evidence," including evidence that might not otherwise warrant a remand for new evidence). Relevant evidence may include evidence subsequent to the prior decision and/or subsequent to the expiration of insured status where such evidence is relevant to the determination of whether an impairment existed as well at an earlier time. *E.g., Ivy v. Sullivan*, 898 F.2d 1045, 1048 (5th Cir. 1990).

# UNITED STATES DISTRICT COURT

# MIDDLE DISTRICT OF LOUISIANA

**DENNIS VALENTINE, JR.**  CIVIL ACTION

**VERSUS**  NUMBER 10-510-JJB-DLD

**MICHAEL J. ASTRUE, COMMISSIONER
OF SOCIAL SECURITY**

## NOTICE

Please take notice that the attached Magistrate Judge's Report has been filed with the Clerk of the U.S. District Court.

In accordance with 28 U.S.C. §636(b)(1), you have 14 (fourteen) days from date of receipt of this notice to file written objections to the proposed findings of fact and conclusions of law set forth in the Magistrate Judge's Report. A failure to object will constitute a waiver of your right to attack the factual findings on appeal.

**ABSOLUTELY NO EXTENSION OF TIME SHALL BE GRANTED TO FILE WRITTEN OBJECTIONS TO THE MAGISTRATE JUDGE'S REPORT.**

Signed in Baton Rouge, Louisiana, on March 1, 2012.

_____
**MAGISTRATE JUDGE DOCIA L. DALBY**